# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-CA-00169-COA

**THE AVION GROUP, INC.**                                                      APPELLANT

**v.**

**THE CITY OF OXFORD, MISSISSIPPI**                                   APPELLEE

DATE OF JUDGMENT:            02/06/2023
TRIAL JUDGE:                       HON. KENT E. SMITH
COURT FROM WHICH APPEALED:   LAFAYETTE COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT:     EMILY HAMM HUSETH
                             BENJAMIN DWYER WEST
ATTORNEYS FOR APPELLEE:      PAUL BOWIE WATKINS JR.
                             POPE SHANNON MALLETTE
NATURE OF THE CASE:          CIVIL - OTHER
DISPOSITION:                 AFFIRMED - 03/05/2024
MOTION FOR REHEARING FILED:

### BEFORE WILSON, P.J., GREENLEE AND McDONALD, JJ.

### McDONALD, J., FOR THE COURT:

¶1. Pursuant to Mississippi Code Annotated section 11-51-75 (Rev. 2019), the Avion Group Inc. (Avion) appeals from the judgment of the Lafayette County Circuit Court that affirmed the City of Oxford's decision to deny Avion an ordinance variance to repair a wall/fence that enclosed Avion's property.[1] Avion contends that (1) it did not waive its argument that the City misinterpreted its land development code; (2) that under the provisions of the code in effect at the time of the variance request, Avion did not need to seek

---

[1] Section 11-51-75 provides for appeals of decisions of a municipality, stating in part:

> Any person aggrieved by a judgment or decision of the board of supervisors of a county, or the governing authority of a municipality, may appeal the judgment or decision to the circuit court of the county in which the board of supervisors is the governing body or in which the municipality is located. . . .

a variance; and in the alternative, (3) if a variance was required, the City acted arbitrarily and capriciously in denying Avion's application. Having considered the arguments of the parties, the record, and relevant precedent, we affirm the circuit court's decision.

**Facts**

¶2.     Avion Group owned a contract interest in an older residence located in Oxford that was surrounded by a brick wall/fence.[2] The house was situated sideways on the lot such that the side wall fronts South 8th Street, a public street. The wall had columns at each corner and a span of bricks stretching between them. On top of the brick portion of the wall span, which Avion measured at 5' 6", was a decorative iron railing that extended another 13 inches, making the wall span portion 6' 7" high. The brick columns at each corner measured 6' 9" and had no iron railings. The City disagreed with these heights, saying that the brick portion of the wall span between the columns measured +/- 5.3 feet and the columns measured +/- 6.6 feet. The City provided no measurement for the height of the iron rail.

*Damage to the Column in 2011*

¶3.     In 2011, the City replaced a portion of the sewer line along the street where Avion's residence was located. According to Avion, the City excavated a large amount of earth near the north column of Avion's wall, which caused the column to separate from the rest of the wall. In January 2012, the occupant of the house, Gov Slayer, met with City officials (Director of Public Works Bart Robinson, Assistant City Engineer Keanna Mayoral, the project manager for Eubanks Construction Rob Rogers, and the project foreman) concerning

---

[2] The extent of Avion's interest is unknown.

2

the damage. Slayer requested that the City repair the damage, but the officials refused, saying that the City's work was not the cause.

¶4.    In a follow-up letter to Robinson, Slayer wrote that in their prior meeting, he had pointed out to the city engineer that the City had a backhoe on pods parked for a day-and-a-half at the exact spot where the wall separated from the column. Slayer said that the backhoe was pounding the ground "like a mini-earthquake" because the workers could not locate the sewer tie-in and were hitting rock. Slayer said he felt the shock wave inside the house and that it caused a crack in his ceiling. Slayer also said that the City had dug a hole at the base of the column and left it there for weeks.

¶5.    But according to the City Planning Department, the City engineers inspected the column, the wall, and a deck that abutted the wall in 2011. Planner Paige Barnum later told the Planning Commission that Engineer Robinson determined the damage was due to settlement caused by large holes dug around the footings of the wall on the inside. According to Barnum, Robinson found:

> [T]he footings of the wall were visibly exposed and undermined, with little or no soil supporting the footings. Differential settlement of the wall was causing the cracking witnessed. Slayer was informed that the City would not accept responsibility for the cracking, and he was informed the wall would continue to crack unless he took some action to support the footings underneath the wall.

This quote is an excerpt of Barnum's planning comments and recommendations (March 12, 2018). Neither Avion nor Slayer pursued any claim against the City for the damage, and no repairs were made to the column or wall span for over five years.

    *Adoption of Land Development Code*

3

¶6.     In November 2017, the City adopted a Land Development Code.  The code defined

a "fence" in Section 10.2.112 as "an enclosure or barrier intended to mark a boundary, screen

a view or prevent intrusion.  (See also, Wall)."  Section 10.2.327 defined an exterior "wall":

> Wall, exterior: An enclosing structure made of brick, stone, earth or other
> materials intended to mark a boundary, screen a view, or prevent intrusion.

Code section 3.2.8 required that fences and walls fronting a public street not exceed 4 feet

in height:

> Fences, Walls, and Hedges.  Fences, walls and hedges may be permitted in any
> required yard, or along the edge of any yard, provided that no fence, wall, or
> hedge along the side or edge of any yard that fronts on a public street shall be
> over four feet in height.  Article 5, Site and Design Standards may allow taller
> fences, walls, and hedges to serve as screens in certain circumstances.  These
> requirements do not pertain to retaining walls governed in Section 3.2.16.[3]

The Site and Design Standard in Article 5 (Section 5.5.2) described the materials and design

for fences and walls, such as a requirement that the "finished" part of the fence face the

exterior of the property.  Nowhere, however, does the code indicate how to measure the

height of a fence or wall, especially a wall with columns that are taller than the wall span

between them.  There are other code sections that specify how to measure the heights of other

structures:

> * Height of a retaining wall shall be measured from the adjacent grade to the
> top of the wall (Sec. 3.2.18.3);
>
> * Sign height shall be calculated from the ground level to the uppermost top
> of the frame or calculated area as stated in Section 7.2.7 (Sec. 7.2.8.1); and
>
> * Building height: the vertical distance measured from the average grade plan

---

3  Notably, the code did not include a visibility requirement in its regulation of the
height of fences or walls.

to the average height of the highest roof surface (Sec. 10.2.40).

¶7.     Even though both the columns and the wall span around Avion's property exceeded the four-foot height limitation, they existed before the passage of the ordinance, and it is undisputed that both were deemed to be legal nonconforming structures.[4]

*Avion's 2017 Repairs*

¶8.     Shortly after the City's adoption of the code, Avion decided to repair the damaged column. Over time, the north column was leaning and had separated nearly three inches from the wall. On December 5, 2017, Avion representative Lendy Edwards called Flint Ussery of the City's Building Department to let him know that the repair work would begin that day.[5] Avion felt this repair was allowed under the code without the need for any other official permission from the City because Section 3.1.5.2 specifically stated:

> Repair and Maintenance Permitted. Normal repair and maintenance may be performed to allow the continuation of a nonconforming structure.

---

[4] Both parties agree that Avion's fence was a legal nonconforming structure under Section 3.1.5 of the 2017 code:

> Nonconforming Structures, excluding signs. A legal nonconforming structure is a structure included a building, existing legally at the time of the passage of this Code, or the time of annexation into the city's jurisdiction, which does not because of design or dimensions conform to the regulations of the district in which it is situated. A structure established after the passage of this Code which does not conform to regulations of the district in which it is situated shall be considered an illegal nonconforming structure and is a violation of this Code. Legal nonconforming structures may continue only in accordance with all the following provisions. . . .

[5] Avion's representative told the Planning Commission in 2022 that she was unaware that the permit obtained had expired. The City, however, contended that it learned of Avion's work from a neighbor who had complained about the height of Avion's repaired fence.

5

¶9. In making the repair, Avion hydraulically lifted the column back onto its footing and decided to reinforce it by removing the iron railing on the top of the wall span and replacing it with brick to brace the column. Avion presented no evidence that it had consulted with an engineer to determine that adding bricks to the wall span was necessary to repair the column. Avion reasoned that this method of repair would not change the overall height of the entire wall, which it considered to be measured by the height of the columns. According to Avion, the repair complied with Section 3.1.5.3 of the code, which allowed enlargements of nonconforming structures:

> Certain Enlargements Permitted. Any nonconforming structure may be enlarged if the expansion does not increase the nonconformity

¶10. After the column was correctly positioned and the iron rails on the wall span were removed, due to a miscommunication with the bricklayer, nine layers of bricks were laid on the wall span, causing it to exceed not only the span's prior height with the iron railing but also the height of the columns. Apparently a neighbor complained to the City about the work Avion had done and the City issued Avion a stop work order on December 7, 2017. The City told Avion that before work could continue, Avion needed to secure a height variance from the Planning Commission and a certificate of appropriateness from the Historic Preservation Committee.[6] After receiving the stop work order, Avion removed two layers of brick from the wall span, so the wall span and the columns were then the same height. Again, Avion considered the height of the entire wall to be measured by the height of the columns and

---

[6] The Planning Commission stated that it issued height variances, but the Historic Preservation Committee would determine the appropriateness of any construction work. It did not matter which body acted first.

contended that its repair work had not increased the structure's nonconformity. However, the City still insisted that Avion needed a variance because Avion had increased the height of the nonconforming brick portion of the wall span between the columns by adding these seven layers of brick.

*Avion's Application for a Variance and Planning Department Response*

¶11.    On February 16, 2018, Avion applied for a 16-inch variance to the height of the wall (the height of the seven layers of brick). In the application, Avion stated that it needed the height variance to accommodate the repairs that were necessary because of damage caused by the City's prior sewer work. Avion said that the work would stabilize the wall (i.e., the column) and was the most cost-efficient way to accomplish stabilization. Avion secured a letter from an engineer, Mark Watson, who had evaluated the wall after the repair work. In the letter, he opined that the "brick brace reinforced the integrity of the wall." He stated that the band of brick along the top of the wall span provided additional rigidity, braced the column at the top, and prevented it from rotating.

¶12.    The City Planning Department responded to Avion's application in a report sent to the Planning Commission from City Planner Barnum on March 12, 2018. The report stated:

> Prior to December 2017, the brick fence in the front yard of the property measured +/- 5.3 feet in height and was capped at two ends by columns measuring +/- 6.6 feet in height, already higher than the height allowed for a front yard wall.

The City made no mention of the iron work on top of the brick rails and clearly felt that the wall's height was measured by the 5' 3" height of the brick portion of the wall span between the columns and not by the height of the columns. Barnum reported that after Avion's work,

7

the wall span (not just the columns) was now +/- 6.6 feet. Barnum also said that City engineers contested Avion's claim that the City's sewer work had caused any damage.

¶13. Barnum noted that under Section 9.4 of the City's Land Development Code, a variance shall not be granted unless the application demonstrated:

> a. That special conditions and circumstances exist which are peculiar to the land, structure, or building involved and which are not applicable to other lands, structures, or buildings in the same district;
>
> b. That literal interpretation of the provisions of this ordinance would deprive the applicant of rights commonly enjoyed by other properties in the same district under the terms of this ordinance;
>
> c. That the special conditions and circumstances do not result from the actions of the applicant; and
>
> d. That granting the variance requested will not confer on the applicant any special privilege that is denied by this ordinance to other lands, structures, or buildings in the same district.

Barnum told the Commission that the planning staff had found no special circumstances unique to the property that warranted a height variance. Barnum also noted that the yard's fence was ornamental and held no earthwork necessary to the stability of the site, (i.e., it was not a retaining wall). Barnum said that issuing a variance would give Avion a special privilege that would otherwise be denied to other properties in the same district. In summary, the staff recommended that the variance be denied and that Avion be required to remove the added brick and return the wall to its prior condition or lower the wall to the current standard of no more than four feet in height.

*Planning Commission Hearing*

¶14. On the same day as the Planning Department memo, March 12, 2018, the Planning

Commission held a public hearing on Avion's application. There is no transcript of the proceedings; however, the minutes contain the content of the parties' presentations.

¶15. Avion representative Edwards presented photographs of the damage to the column wall that Avion contended resulted from the City's work. She also submitted the letter from Engineer Mark Watson, and another Avion engineer, Hill Lewis, testified in person. The minutes reflected Lewis's opinions:

> Chairman Hyneman asks Mr. Lewis if the brick is being added to support the columns; Mr. Lewis says you can see on [the] wall where it was twisted real bad, damaged; says column was jacked back into vertical alignment, jacking column back into place induced stress. Mr. Lewis says he thinks added brick reinforced column; is his understanding column was damaged in sewer process.

In response, the minutes reflect that the City's Assistant Engineer Mayoral was questioned as well and adamantly asserted that the City never damaged the column. Barnum also said that the staff had not been provided Avion's supplemental structural reports beforehand, so they were not considered in the report. But Barnum did not present any rebuttal evidence to Engineer Watson's evaluation of the work Avion had done or Lewis's opinions on the brickwork's effect on the column's stability.

¶16. One of the Commissioners pointed out that Engineer Watson's letter to Avion indicated that the additional brickwork "may not fully prevent further rotation of the column in the event of foundation movement." The Commissioner added that the letter did not state that foundation issues were being addressed by the brickwork added to the wall span, which is the issue. This Commissioner felt that granting the variance did not deal with a foundation issue and that the wall was cosmetic. Thus, he felt the request for the variance was not

9

supported. Another Commissioner noted that there were crepe myrtles and a root system that may have impacted the wall.

¶17. After hearing the presentations, the Planning Commission noted the criteria required for granting a variance and voted 6-0 to deny Avion's request. At that same meeting, the Commission amended Section 3.2.8 dealing with fence height to require that "any fence must now allow for visibility."

*Avion's Appeal to the City Board of Aldermen*

¶18. Avion appealed the Planning Commission's decision to the City Board of Aldermen.[7] Before the hearing on the appeal, Avion submitted to the Board the same evidence it had presented to the Planning Commission, as well as photographs of other nonconforming walls and fences in the area to show that there were several other fences in the neighborhood that were the same height as Avion's. The City's Planning Director, Judy Daniel, submitted a memorandum in response to Avion's appeal. In it, Daniel pointed out that Avion's fence with the additional brick was now 6.6 feet. She reviewed what had been presented to the Planning Commission and addressed the photographs that Avion had presented to show that there were other fences in the area that were similar in height to Avion's. Daniel said that some photos were irrelevant, such as the photos of a wall separating two condominiums and photos of side fences, but not front fences like Avion's. Those photos of front fences showed fences that had existed for a long time and had not been constructed pursuant to any variance. Moreover, none of them obscured the view of the residence.

---

[7] An attorney appeared on behalf of Slayer, but at the approval and on behalf of Avion as well.

¶19. There was no transcript of the Board of Aldermen's proceedings on June 5, 2018, when the Board considered Avion's appeal, leaving the Board minutes as the only record of its deliberations. The Board heard both sides of the controversy, noting that the Planning Department considered the wall already "nonconforming" and that the addition of the layers of brick on top of the wall increased the nonconformity. The minutes reflect the following:

> After a lengthy discussion, the Mayor called for a motion to overturn the decision made by the Planning Commission and after receiving none, declared the item had died for lack of a motion. The Planning Commission's denial of the requested variance stands.

*Avion's Appeal to Circuit Court*

¶20. Avion prepared a bill of exceptions and appealed the decision of the Board of Aldermen to the circuit court on October 12, 2018. In its notice of appeal to the circuit court, Avion stated that it was appealing the decision of the Mayor and Board, "upholding the Planning Commission's denial of Lendy Alderson Edwards's request for a height variance for a front yard fence." In its initial memorandum brief, Avion stated that it appealed

> the City's demand [that] it obtain a height variance on the basis [that] the repair did not exceed the pre-existing height of the Fence Columns. The Code makes no distinction between the heights of the columns versus the height of the other elements of fences.

Avion argued that the code did not differentiate between the heights of "fences" or "columns" when determining the height of a structure or distinguish between the materials used, i.e., brick or iron. Avion contended that the height of the fence was the height of the columns and thus the City's request that Avion seek a variance was incorrect under the code. Alternatively, Avion argued that the City's denial of its variance request was arbitrary,

11

capricious, and unsupported by substantial evidence. Avion contended that the Board of Aldermen had ignored other evidence, including proof that the City's sewer work caused the damage that required the repairs, making the Board's decision arbitrary and capricious. Avion asked the circuit court to either determine that Avion did not need a variance or, in the alternative, if it did, order that the City grant Avion's variance request.

¶21. While the appeal was pending before the circuit court, the Mississippi Supreme Court decided *Wheelan v. City of Gautier*, 332 So. 3d 851, 859 (¶19) (Miss. 2022), *rev'g*, 332 So. 3d 863 (Miss. Ct. App. 2021), and held that ordinance interpretation should be reviewed de novo. The circuit court allowed the parties to file supplemental briefs on that issue and heard arguments on the matter on August 12, 2022.

¶22. On January 6, 2023, the circuit court issued its "Findings of Fact and Conclusions of Law" and ruled that Avion never asked the Board of Aldermen to reconsider the interpretation of the ordinances to determine if Avion needed to request a variance at all. The court stated that there was no decision of the City's governing authorities on the interpretation of the code from which Avion could appeal because Avion only requested the Board to consider the Commission's denial of Avion's variance application as noted in Avion's notice of appeal. The court found that Avion had pointed to no proof in the record that the Board of Aldermen rendered a "judgment or decision" on the Planning Department's interpretation of that code. Thus, because Avion did not raise the interpretation issue below, the Court could not consider it.

¶23. "However," the court stated, "the Court would not find in Avion's favor even if the

issue were properly before it because the City's interpretation of the Code was not incorrect." The circuit court held that "Avion is correct that the Court would review the City's interpretation of its own ordinance *de novo*." The court concluded that the plain terms of the code did not allow Avion to replace the iron railing with bricks to a height that exceeded the height of the original decorative railing. Therefore, Avion was required to seek a variance.

¶24. The circuit court held that Avion had also not demonstrated that the denial of a variance was arbitrary and capricious. The court ruled that *Wheelan* did not change the standard of review concerning an adjudicative municipal zoning decision and the City is entitled to a rebuttable presumption that its decision was valid. The City was the finder of fact and the judge of witnesses' credibility. The court would not reweigh the City's decision that it had not caused the damage to the wall. Nor could the court substitute its judgment of whether a "special circumstance" warranted a variance, or whether Avion had shown it had been deprived of rights enjoyed by other property owners in the area simply by producing pictures of other nonconforming structures.

¶25. The circuit court entered a final judgment on February 6, 2023, and Avion appealed.

*Issues on Appeal*

¶26. Avion contends on appeal before this Court: (1) that the issue of whether a variance was required at all under the City's code, (i.e., the interpretation of the Land Development Code) was properly presented to the circuit court and, thus, not waived, (2) that Avion did not need a variance to repair the wall because it did not "increase the nonconformity" according to the code provisions, and (3) that if a variance was required, the Commission and

the Board of Aldermen acted arbitrarily and capriciously in denying Avion's application.

## Standard of Review

¶27. The Mississippi Supreme Court has held that "[t]he interpretation of zoning ordinances presents a question of law." *Wheelan v. City of Gautier*, 332 So. 3d 851, 856 (¶¶16-17) (Miss. 2022). Prior to *Wheelan*, the supreme court noted in *King v. Miss. Mil. Dep't*, 245 So. 3d 404, 407 (¶9) (Miss. 2018), that it had "backed away from showing 'great deference' to agency interpretations of statutes." This is due in large part to Mississippi's Constitution requiring a "strict separation of powers." *Wheelan*, 332 So. 3d at 859 (¶18) (citing *Gunn v. Hughes*, 210 So. 3d 969, 972 (¶13) (Miss. 2017)). Accordingly, the *Wheelan* decision established that the interpretation of zoning ordinances are "pure questions of law. . . to be reviewed de novo." *Id*. at 859 (¶19). In our de novo review, "we must consider the common and accepted usage of the words in the ordinance and the general structure of the ordinance as a whole." *Keenum v. City of Moss Point*, 368 So. 3d 817, 820 (¶7) (Miss. Ct. App. 2023).

¶28. If the City's interpretation of an ordinance is correct, its action still may be invalid if it "(1) was beyond its scope or power; (2) violated the constitutional or statutory rights of the aggrieved party; (3) was not supported by substantial evidence; or (4) was arbitrary or capricious." *City of Ocean Springs v. Illanne*, 360 So. 3d 221, 223 (¶8) (Miss. 2023) (citing *Jones v. City of Canton*, 278 So. 3d 1129, 1131 (Miss. 2019)).

## Discussion

I.     **Whether Avion waived its challenge to the City's interpretation of the Land Development Code.**

14

¶29. Avion argues that it did not need to seek a variance at all because the City's interpretation of the provisions of the Land Development Code was incorrect. The City responds that Avion is barred from arguing this issue because Avion did not raise the code's interpretation in either the Planning Commission proceedings or the appeal to the Board. Because the circuit court ruled that Avion had waived this issue, we must first decide whether the circuit court had jurisdiction to consider Avion's appeal of the City's interpretation of the provisions of its Land Development Code.

¶30. "This Court conducts a de novo review on the issue of whether a circuit court has jurisdiction to hear a particular matter[,] as it is a question of law." *Reeves v. City of Crystal Springs*, 54 So. 3d 322, 324 (¶6) (Miss. Ct. App. 2011) (citing *Raspberry v. City of Aberdeen*, 964 So. 2d 1211, 1213 (¶7) (Miss. Ct. App. 2007)). Here the circuit court based its holding on the fact that the City's code specifically provided that a party may appeal an interpretation of an ordinance in Section 9.5.1.2 (allowing administrative interpretation to be appealed to the Planning Commission), and that Avion did not pursue such an appeal. Instead, Avion appealed the City's decision on its variance application. However, the Mississippi Supreme Court's decision in *Wheelan* illustrates that a circuit court need not be presented with the direct appeal of an interpretation of an ordinance but that the issue of the meaning of an ordinance is a threshold question in the appeal of any action of a City concerning ordinance enforcement. *Wheelan*, 332 So. 3d at 859 (¶19).

¶31. In *Wheelan*, the City of Gautier had granted Vindich a permit to build a garage/workshop on his property. *Id*. at 852 (¶1). After the structure was nearly completed,

15

Vindich's neighbor Wheelan filed suit in chancery court, claiming that the City's action was really the grant of a variance, which required a public hearing, and that he was denied due process. *Id*. To determine the issue, the chancery court deferred to the City's interpretation of its ordinance. *Id*. at 853 (¶2). On appeal, this Court affirmed, with Judge Wilson dissenting, before certiorari review. *Id*. at (¶3). The Mississippi Supreme Court reversed our decision because the City's interpretation and application of the ordinance rendered other portions of the ordinance "unworkable." *Id*. The Supreme Court stated:

> [W]e take the present opportunity to bring our standard of review of local authorities' interpretations of zoning ordinances in line with our traditional and common law de novo standard when reviewing questions of law. The interpretation of zoning ordinances presents a question of law; almost all of our sister states have so noted.

*Id*. at 856 (¶26). The Supreme Court noted that "the ultimate authority and responsibility to interpret the law, including statutes, rests with this court." *Id*. at 859 (¶18) (quoting *Queen City Nursing Ctr Inc. v. Miss. State Dep't of Health*, 80 So. 3d 73, 84 (¶28) (Miss. 2011)). The Court stated, "While the record is replete with hearings and claims, the legal issue at hand is straightforward, i.e., whether or not the city's interpretation of [the relevant code section] is correct." *Id*. at 859 (¶20). Accordingly, even though no party directly appealed the City's interpretation of the code, the Supreme Court still dealt with the issue.

¶32. In *Keenum*, the City of Moss Point raised the same waiver argument that the City of Oxford raises here. Moss Point claimed that Keenum had not raised the issue of whether the City had violated the zoning code in granting a special exception for a prohibited use when Keenum appealed the adjustment board's decision to either the City Board or the circuit court. *Keenum*, 368 So. 3d at 822 (¶13). However, this Court rejected the City's claim of

16

waiver because Keenum had raised the issue in his notice of appeal and in his brief to the circuit court. *Id*.

¶33. In the case at hand, Avion clearly stated in its initial memorandum brief to the circuit court that it was appealing the City's interpretation of the code provisions concerning the measurement of the height of the wall. Before arguments to the circuit court, the Supreme Court decided *Wheelan* and the circuit court allowed the parties to file supplemental briefs in light of this change in the law. Avion and the City each presented their reading and application of the various code sections, and the circuit court ultimately decided on an interpretation. Thus, to determine whether the City improperly denied Avion's request for a variance, the circuit court first decided that the City's interpretation of the Land Development Code was correct and then considered Avion's arbitrary-and-capricious argument. Accordingly, we find that Avion had raised the issue to the circuit court and did not waive its challenge to the City's interpretation of the Land Development Code.

**II. Whether the circuit court's interpretation of certain code provisions was erroneous.**

¶34. In *Wheelan*, the Supreme Court indicated how to determine the correctness of a City's interpretation of its zoning ordinances.[8] Citing *Hemphill Constr. Co. v. City of Clarksdale*, 250 So. 3d 1258 (Miss. 2018), the Supreme Court stated that a local governmental body is precluded "from adopting a construction of its ordinance that renders meaningless other parts of the same ordinance." *Wheelan*, 332 So. 3d at 859 (¶20).

---

[8] The Supreme Court adopted the reasoning in Judge Wilson's Court of Appeals dissent. *Id*. at 860-61 (¶23).

17

¶35. We followed this method in *Keenum*, stating, "We must not adopt an interpretation of an ordinance that renders other parts of the same ordinance meaningless." *Keenum*, 368 So. 3d at 819 (¶5). In *Keenum*, the City of Moss Point had affirmed the Board of Adjustment's grant of Frankie Brown's application for a special exception to the city's zoning ordinances, which allowed Brown to construct a "semi-public recreational area" in a single-family residential community. *Id*. at 818 (¶4). A neighbor appealed the city's decision to the circuit court, which, pre-*Wheelan*, found that the city had not acted arbitrarily or capriciously. *Id*. at 819 (¶4). When the matter was appealed and assigned to this Court post-*Wheelan*, we stated that "[t]he question we are called to answer is whether Moss Point erred in its interpretation and application of its ordinance by granting the special exception for Brown's project." *Id*. at (¶6). To do this, we stated:

> "[Z]oning ordinances should be given a fair and reasonable construction, in the light of their terminology, the objects sought to be obtained, the natural import of the words used in common and accepted usage, the setting in which they are employed, and the general structure of the zoning ordinance as a whole." *City of Gulfport v. Daniels*, 231 Miss. 599, 604-05, 97 So. 2d 218, 220 (1957).

*Id*. at 819-20 (¶7). We proceeded to examine various terms and definitions in the ordinances and ultimately concluded:

> There is nothing in the record before us that shows Moss Point considered that Brown's commercial for-profit venture he proposed was a prohibited use under the Zoning Ordinance. Instead, Moss Point's interpretation of "semi-public recreational area" in this instance would render meaningless the clear prohibition of commercial uses in R-1A zones.

*Id*. at 821-22 (¶12). For this reason, we reversed. *Id*. at 822 (¶14).

¶36. In this case, the circuit court undertook a de novo review of the City of Oxford's interpretation of the Land Development Code pursuant to *Wheelan* and found the City's

18

interpretation to be correct. We review the circuit court's decision de novo because we are to use the same standard of review as utilized by the circuit court. *See Davis v. Guido*, 308 So. 3d 874, 878 (¶9) (Miss. Ct. App. 2020) ("An appellate court reviews a chancery court's decision regarding an agency's action under the same standard of review that the chancery court was bound to follow.").

¶37. First, we note that Oxford's Land Development Code does not direct how to measure a wall such as Avion's where a column at the corner is higher than the wall span attached to it. Because of this, wall height requirements under the code for a wall such as Avion's are subject to several interpretations. "Statutory interpretation is appropriate when a statute is ambiguous or silent on a specific issue." *K&C Logistic, LLC v. Old Dominion Freight Line Inc.*, 374 So. 3d 515, 523 (¶24) (Miss. 2023).

¶38. Avion contends that because the wall includes the columns at each corner, the height of its entire wall should be measured by the height of the columns (6' 9"). Thus, Avion argues that its repair to the damaged column by replacing the iron rails on the wall span with brick up to the height of the column did not affect the wall's nonconformity. It did not seek a variance because, as a grandfathered-in nonconforming wall, the code allowed repairs that did not "increase" the non-conformity. In Avion's opinion, its repair did not increase the overall wall's nonconformity.

¶39. The City's position, although not as clear nor consistent, was to consider the "wall' as having two parts, the columns and the wall span between them. The Planning Department's March 12, 2018 memo states, "Prior to December 2017, the brick fence in the front yard of the property measured +/- 5.3 feet in height and was capped at two ends by

19

columns measuring +/- 6.6 feet in height." The memo obviously is referring to the height of the brick wall span between the two columns. It states that Avion's repair work "brought the entire fence to approximately +/- 6.6 feet in height (not just the columns)." The Planning Department recommended that Avion "be required to remove the added brick and return the wall to its prior condition, or to lower the wall to the current standard of no more than four feet high." The City, then, defined the height of the wall by the height of the wall span between the columns.

¶40.   Because the code is silent on how to measure the overall height of a composite wall such as Avion's, we cannot look to any code provision concerning wall height measurement to determine whether the City's interpretation of the code resulted in the correct decision that Avion needed a variance. However, viewing the overall wall as two separate structures (the wall span and the columns), the code provisions on nonconforming structures help. At the time of the adoption of the code, according to Avion, its "wall" consisted of columns measuring 6' 9" and a connecting 5' 6" wall span made of brick and 13 inches of iron railing, for a total of 6' 7" in height. These heights established the maximum heights of each of these legal nonconforming structures under Section 3.1.5. Under Section 3.1.5.2, repairs may be made to *continue* nonconforming structures, but under Section 3.1.5.3, the nonconforming structure may not be increased. Avion's repairs did not affect the height of the column, so the repair to it complied with the code. However, the manner that Avion chose to make the repair affected the height of the other nonconforming part of the wall (the wall span) and increased it from a total of 6' 7" to 6' 9" in height. The circuit court's interpretation of the code is consistent with the provisions concerning nonconformity and renders no other

20

provision in the code meaningless. Accordingly, we find no error in the circuit court's determinations that Avion's repairs violated the Land Development Code and that a variance was needed.

> ### III. Since a variance was required, whether the Planning Commission and the Board of Aldermen acted arbitrarily and capriciously in denying Avion's application.

¶41. Having determined that the circuit court was correct in holding that Avion needed to secure a variance for its repair work to remain as completed, we now turn to the court's decision that the City had not acted arbitrarily or capriciously in denying Avion's variance application.

¶42. In making its ruling, the circuit court stated that *Wheelan* did not change the standard of review concerning an adjudicative municipal zoning decision and that the City was entitled to a rebuttable presumption that its decision was valid. We agree to the extent that the rebuttable presumption arises only when the circuit court has completed its de novo review and found the City's denial of a variance was based on a correct interpretation of its ordinances. Even before *Wheelan*, we began a review of a City's grant or denial of a variance with an examination of the City's ordinances. *Harrison v. Mayor & Bd. of Alderman of City of Batesville*, 73 So. 3d 1145, 1153 (¶20) (Miss. 2011) ("In reviewing the grant of a variance, we start with the governing zoning ordinances."). More recently in *Keenum*, although the circuit court affirmed Moss Point's grant of a special exception to its zoning ordinances because it found the decision was not arbitrary or capricious, on appeal, we first examined the City's interpretation of its zoning ordinances. *Keenum*, 368 So. 3d at 819-22 (¶¶6-12). Finding Moss Point's interpretation to be incorrect, we reversed the City's grant

of Brown's request for a special exception and rendered judgment, without undertaking an arbitrary-and-capricious analysis. *Id*. at 822 (¶¶14-15). Therefore, if we find that the circuit court's de novo review of the City's action was based on a correct interpretation of the City's zoning ordinance, we may then proceed to examine those actions under the arbitrary and capricious standard.

¶43. A variance generally is defined as the "right to use or to build on land in a way prohibited by strict application of a zoning ordinance." *Harrison,* 73 So. 3d at 1150-51 (¶14). The grant or denial of a variance is adjudicatory rather than legislative. *Id*.; *see also Mayor & Bd. of Aldermen of Prentiss v. Jefferson Davis County*, 874 So. 2d 962, 964 (¶6) (Miss. 2004). On appeal, a decision by the city, like a decision of any administrative agency, may be reversed if it was unsupported by substantial evidence, arbitrary or capricious, beyond its authority, or violated a constitutional or statutory right of a party. *Id*.

¶44. These key factors for analysis have been further defined:

> An arbitrary decision is one not done according to reason or judgment, but depending on the will alone. A capricious decision is one implying either a lack of understanding of or a disregard for the surrounding facts and controlling principles. Substantial evidence is something less than a preponderance of the evidence but more than a scintilla or glimmer. The role of a reviewing court is not to "reweigh the evidence" but only "to verify [that] substantial evidence exists."

*Hickman v. City of Biloxi*, 313 So. 3d 541, 545 (¶11) (Miss. Ct. App. 2021) (citation and internal quotation marks omitted); *see also Thomas v. Bd. of Sup'rs of Panola Cnty.*, 45 So. 3d 1173, 1181 (¶22) (Miss. 2010) ("[C]apricious" is defined as any act done without reason, in a whimsical manner, implying either a lack of understanding of or a disregard for the surrounding facts and settled controlling principles.). A decision cannot be considered

22

"arbitrary" or "capricious" if it is fairly debatable. *Gillis v. City of McComb*, 860 So. 2d 833, 836 (¶6) (Miss. Ct. App. 2003). "Substantial evidence" is "such relevant evidence as reasonable minds might accept as adequate to support a conclusion." *Como Steak House Inc. v. Bd. of Sup'rs of Panola Cnty.*, 200 So. 3d 417, 422 (¶15) (Miss. 2016). "The party challenging the decision bears the burden of proof." *Caver v. Jackson Cnty. Bd. of Sup'rs*, 947 So. 2d 351, 353 (¶6) (Miss. Ct. App. 2007).

¶45. This Court, as well as the circuit court, are not triers of fact in appeals of zoning matters. *Perez v. Garden Isle Cmty. Ass'n*, 882 So. 2d 217, 219 (¶6) (Miss. 2004) (citing *Board of Aldermen v. Conerly*, 509 So. 2d 877, 885 (Miss. 1987)). The administrative body is the trier or fact "as well as the judge of the witnesses' credibility." *Ryan v. Miss. Real Est. Comm'n*, 217 So. 3d 725, 730 (¶15) (Miss. Ct. App. 2017). "Where the point at issue is 'fairly debatable,' we will not disturb the zoning authority's action." *Id*.

¶46. Applying these principles to the case at hand, we find no basis for disturbing the circuit court's decision that the City correctly denied Avion's request for a variance. According to Section 9.4.1 of the Land Development Code, a variance shall not be granted unless a written application for a variance demonstrates the following:

> a. That special conditions and circumstances exist which are peculiar to the land, structure, or building involved and which are not applicable to other lands, structures, or buildings in the same district;
>
> b. That literal interpretation of the provisions of this ordinance would deprive the applicant of rights commonly enjoyed by other properties in the same district under the terms of this ordinance;
>
> c. That the special conditions and circumstances do not result from the actions of the applicant; and

d. That granting the variance requested will not confer on the applicant any special privilege that is denied by this ordinance to other lands, structures, or buildings in the same district.

Avion contends that it presented sufficient proof of each factor and/or that the City acted arbitrarily in rejecting its proof. We disagree.

### 1. *Special Circumstances*

¶47. Avion argues that the special circumstance in this case was that the City caused the damage. However, Avion presented no engineering report or expert testimony to establish that the City's work caused the damage. Avion merely relied on photographs and lay witness testimony. On the other hand, the City presented testimony from its engineers who evaluated the column and fence in 2011, both inside and out, and it was their professional opinions that the damage came from "large holes dug around the footings of the wall on the inside that were visibly exposed and undermined, with little or no soil supporting the footings." Moreover, although Avion insisted the City caused the damage, Avion never pursued any legal action against the City in 2011 when the damage occurred. Nor did Avion attempt to repair the wall for over five years, allowing its condition to deteriorate further. At best, Avion's evidence created a factual dispute about who caused and contributed to the damage. Such factual disputes are not for this Court to decide anew. Accordingly, we find no error with the circuit court's finding it could not substitute its judgment for the city officials charged with evaluating that evidence and that Avion had not proven a special circumstance to warrant a variance.

### 2. *Deprivation of Rights*

¶48. Avion contends that it was deprived of the simplest, most cost-effective solution to

the repair of the wall. However, Avion presented no engineering evaluations of the wall prior to the repair giving the options available, or any cost estimates for those various options to justify the additional brick option. Thus the record does not support Avion's contention that adding brick to the wall span was "the simplest, most cost effective" way to repair the column.

¶49. Avion also argues that other property owners in the area had walls that exceeded four feet in height so that denying it a variance deprived Avion of a wall similar to those that others had. But Avion did not prove that the walls and fences it refers to were repaired post-code pursuant to variances granted by the City. Moreover, as the circuit court correctly noted, Section 9.4.2.5 of the code specifically states:

> No nonconforming use of neighboring lands, structure, or buildings in the same district and no permitted use of land, structure or building in other districts shall be considered grounds for the issuance of a variance.

Therefore, Avion is not entitled to a variance just because other walls or fences in the area are as high or higher than its wall.

¶50. In summary, the record reflects that the City's decision to deny Avion's request for a variance was not arbitrary or capricious. There is sufficient evidence to support its decision that Avion had not met the conditions necessary to be granted a variance. The repair undertaken by Avion increased the nonconformity of the wall span in violation of the code; who was responsible for the damage to the wall was in dispute; and Avion presented no evidence that other property owners had received variances to build their walls to the height of Avion's wall. Accordingly, we find no basis to reverse the circuit court's finding that the City had not acted arbitrarily and capriciously in denying Avion's request for a variance.

25

**Conclusion**

¶51.  We hold that Avion had not waived its challenge to the City's interpretation of the Land Development Code because Avion had raised the issue to the circuit court even before *Wheelan* was decided and because post *Wheelan*, we are to review interpretations of zoning ordinances de novo.  Further, we affirm the circuit court's interpretation of the code that Avion's repair increased the wall span's nonconformity because it did not contradict or render meaningless any provision in the code.  Finally, we find no error in the circuit court's determination that Avion had failed to show that the City acted arbitrarily or capriciously in denying Avion's request for a variance.  Accordingly, we affirm the circuit court's judgment.

¶52.  **AFFIRMED.**

   **BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.**